NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

HTA-SCW WEBB MEDICAL A LLC, et al.,
*Plaintiffs/Appellees*,

*v.*

ROSKAMP MANAGEMENT COMPANY,
*Defendant/Appellant.*

No. 1 CA-CV 16-0632
FILED 10-31-2017

---

Appeal from the Superior Court in Maricopa County
No. CV2013-000645
The Honorable J. Richard Gama, Judge *Retired*
The Honorable Dawn M. Bergin, Judge

**AFFIRMED**

---

COUNSEL

Quarles & Brady, LLP, Phoenix
By Michael S. Catlett
*Co-Counsel for Plaintiffs/Appellees*

O'Melveny & Myers, LLP, San Francisco
By Randall W. Edwards
*Co-Counsel for Plaintiffs/Appellees*

Law Offices of Michael J. Farrell, PLLC, Phoenix
By Michael J. Farrell
*Co-Counsel for Defendant/Appellant*

Kaufman, Coren & Ress, PC, Philadelphia
By Douglas Evan Ress
*Co-Counsel for Defendant/Appellant*

---------------

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Maria Elena Cruz joined.

---------------

**J O H N S E N**, Judge:

**¶1**         Roskamp Management Company appeals the superior court's entry of summary judgment in favor of HTA-Sun City, LLC and its 17 affiliates (collectively "HTA").[1]  For the reasons stated below, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**         On December 31, 2009, HTA paid $107 million to buy 17 office buildings from four related entities: KRW MOB-A, LLC; KRW MOB-B, LLC; KRW MOB-C, LLC and KRW MOB-D, LLC.  In addition to paying the $107 million stated purchase price, HTA also agreed to guarantee a $2.5 million debt ("Make-Whole Note") that two of the entities (together "KRW") owed a creditor.  As part of the overall transaction, KRW agreed to a $7 million four-year lease-back of certain of the office suites ("Master Lease") it had sold to HTA.  KRW did not intend to occupy any of the leased premises; instead, the lease-back was a means to lower HTA's effective purchase price to $100 million.[2]  The parties agreed that during the four-

---

[1]      The other entities are HTA-SCW Webb Medical A, LLC; HTA-SCW Webb Medical B, LLC; HTA-SCW Webb Medical C, LLC; HTA-SCW Granite Valley MOB, LLC; HTA-SCW Mountain View, LLC; HTA-SCW West Medical Arts, LLC; HTA-SCW Colonnade, LLC; HTA-SC Lakes Medical Plaza I, LLC; HTA-SC Lakes Club, LLC; HTA-SC 13041 DWB, LLC; HTA-SC Cardiac Care, LLC; HTA-SC Eye Institute, LLC; HTA-SC Boswell Medical, LLC; HTA-SC Boswell West, LLC; HTA-SC Royal Oaks, LLC; HTA-SC Lakeview Medical Arts, LLC; and HTA-SC Lakeview Plaza Centre, LLC.

[2]      As KRW explained in its opening brief, the "underlying real estate transaction involved the sale of 17 medical office buildings . . .

year term of the Master Lease, HTA would be able to market the suites to third parties. The Master Lease and an accompanying Cash Collateral Agreement required KRW to deposit $2.5 million in cash and a $2 million promissory note into an escrow account from which KRW's lease payments would be drawn. In addition, the parties agreed that any rents collected from third-party tenants on the leased premises would secure payment of amounts owed on the Make-Whole Note.[3] Roskamp Management Company, LLC ("Roskamp"), the parent of the various KRW companies, guaranteed KRW's obligations under the Master Lease.

¶3 At closing, HTA had concerns that KRW and Roskamp would not complete all the so-called "Post-Closing Documents" in a timely manner. As an incentive to complete the documentation, HTA negotiated to require KRW to deposit an additional $500,000 into escrow, which would be returned to KRW upon completion of all the deal's documents. One of the Post-Closing Documents was Roskamp's guarantee of KRW's obligations under the Master Lease. At closing, Roskamp executed a version of a Master Lease Guaranty that named HTA-Sun City as the guaranteed lessor ("2009 Guaranty"). Immediately after closing, the parties amended the Master Lease to name the 17 HTA entities as lessors instead of HTA-Sun City. They then prepared a corresponding revised guaranty that correctly listed the lessors in the amended Master Lease—the 17 HTA entities—as beneficiaries of the guaranty ("2010 Guaranty"). Roskamp executed the 2010 Guaranty on April 9, 2010.

¶4 KRW paid HTA the rent due under the Master Lease for more than two years, but then stopped. HTA then sued KRW and Roskamp. An arbitrator awarded HTA $4.6 million against KRW in unpaid rent, late fees,

---

accomplished through a series of complicated interrelated agreements, . . . by which the sellers ultimately would net no less than $100 million and the buyer would pay no more than $107 million."

[3] The sale of the 17 buildings rendered KRW entities subject to a $5 million pre-payment penalty on an existing loan encumbering the property. When the creditor refused to waive the penalty, HTA agreed to guarantee $2.5 million of the penalty in exchange for receipt of the third-party rents.

interest, litigation costs and attorney's fees. The superior court reduced the award to a judgment, which KRW did not appeal.[4]

¶5 After exhausting the escrow account, HTA then turned to its claim against Roskamp, KRW's guarantor, to recover the roughly $3.6 million remaining on the KRW judgment. Although HTA's initial complaint had alleged a claim under the 2009 Guaranty, it amended its complaint after arbitration to state a claim under the 2010 Guaranty. In due course, the superior court granted summary judgment in favor of HTA.[5] We have jurisdiction over Roskamp's timely appeal pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2017) and -2101(A)(1) (2017).[6]

## DISCUSSION

### A. General Principles.

¶6 Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). "We review de novo a grant of summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion." *Ochser v. Funk*, 228 Ariz. 365, 369, ¶ 11 (2011). We also review issues of contract interpretation *de novo*, with the purpose of ascertaining and enforcing the parties' intent. *ELM Retirement Ctr., LP v. Callaway*, 226 Ariz. 287, 290, ¶ 15 (App. 2010). "Any agreement must be construed as a whole, and each part must be read in light of all other parts." *Autonumerics, Inc. v. Bayer Indus., Inc.*, 144 Ariz. 181, 188 (App. 1984).

### B. The Validity of the 2010 Master Lease Guaranty.

¶7 Roskamp first argues the superior court erred by ruling that the 2010 Guaranty was enforceable, disregarding Roskamp's contention that the only operative document is the 2009 Guaranty, the beneficiary of which is HTA-Sun City, which was not a party to the Master Lease.

---

[4] That case was *HTA-SCW v. KRW MOB-A; KRW MOB-B*, No. CV 2015-002628 (Maricopa County Super. Ct. Mar. 10, 2015).

[5] The motion by appellees to make the transcript of the oral argument on summary judgment a part of the record on appeal is granted.

[6] Absent material revision after the relevant date, we cite a statute's current version.

Roskamp argues it submitted evidence sufficient to establish that the 2010 Guaranty was not enforceable because Roskamp did not deliver the guaranty and HTA did not accept it.

**¶8**      "Arizona . . . has always allowed a trial court to admit parol evidence that a contract, fully executed and unconditional on its face, is subject to an oral condition precedent which does not vary or contradict the terms of the written contract." *Anderson v. Preferred Stock Food Mkts., Inc.*, 175 Ariz. 208, 214 (App. 1993). Merely viewing the proffered evidence does not create a genuine dispute of fact as "the judge need not waste much time if . . . the offered evidence is not persuasive." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 155 (1993).

**¶9**      In support of its contentions, Roskamp points to an email from its lawyer, Stacie Gollata, which it asserts constituted a conditional delivery of the 2010 Guaranty and which invited acceptance of the 2010 Guaranty only through specific conduct. In an email exchange in March 2010, however, Gollata confirmed that the 2010 Guaranty was the "final form" of the document to which the parties had agreed. On April 9, 2010, she emailed to HTA the Post-Closing Documents executed by Roskamp, including the executed 2010 Guaranty, and asked HTA's lawyer to have HTA "countersign" and instruct the escrow agent to release the $500,000 to which KRW was entitled upon completion of all of the closing documents. Roskamp argues that because the $500,000 was never released, the 2010 Guaranty did not go into effect. But by executing the 2010 Guaranty, Roskamp expressly waived "notice of acceptance," and the document did not require (or even provide for) countersignature by any HTA party. Additionally, as noted, Gollata confirmed that the 2010 Guaranty was the final form of the document to which the parties had agreed.

**¶10**     Roskamp also argues that the fact that the 2009 Guaranty, rather than the 2010 Guaranty, appeared in the parties' closing binders is evidence the parties intended to adopt the 2009 Guaranty and not the 2010 Guaranty. This argument fails in light of the fact that the "closing" was on December 31, 2009, and Roskamp delivered the signed 2010 Guaranty to HTA in April 2010. When Roskamp signed the 2009 Guaranty contained in the binders, the operative Master Lease named only HTA-Sun City as lessor. Roskamp does not dispute that after the parties amended the Master Lease, they needed to make a corresponding change to the 2009 Guaranty. Nor does Roskamp challenge the express language in both the sale agreement and the 2010 Guaranty that Roskamp offered to guarantee the lease-back obligations in order to induce HTA to enter the overall real-estate transaction.

¶11 More to the point, it is undisputed that Roskamp's guaranty of the Master Lease was an integral component of the parties' complex series of transactions. Roskamp offered no evidence on summary judgment why the 2010 Guaranty should not be enforced. It instead offered only an "interpretation of [its] liability under the Guaranty [which] would render it meaningless *ab initio*. We will not construe a contract so as to render it meaningless." *Provident Nat'l Assurance Co. v. Sbrocca*, 180 Ariz. 464, 465–66 (App. 1994).

## C. Roskamp's Obligations under the 2010 Guaranty.

¶12 The superior court entered summary judgment for HTA in the amount of $4,125,973, including the entirety of the award HTA won against KRW in arbitration, less the amount HTA subsequently recovered from the escrow, plus HTA's costs and attorney's fees. On appeal, Roskamp argues that even if the 2010 Guaranty is enforceable, the judgment exceeds the amount it owes under the guaranty. We address each of its arguments in turn.

### 1. KRW's obligations and reductions.

¶13 The 2010 Guaranty states in unequivocal terms that Roskamp guaranteed KRW's obligations under the Master Lease, and if KRW defaulted at any time, Roskamp would perform KRW's obligations "in the place and stead" of KRW. It also states, however, that Roskamp's obligations "shall be reduced by any amounts contained in the Escrow Account or paid to [HTA] outside of the Escrow Account." Roskamp argues the latter phrase ("paid to [HTA] outside of the Escrow Account") reduces its obligations under the 2010 Guaranty by the amount HTA collected in third-party rent payments.

¶14 As described above, however, KRW and HTA agreed that those third-party rents would be reserved to cover the $2.5 million prepayment penalty created when KRW sold the office buildings, and which HTA had agreed to guarantee. *See* ¶ 2 *supra.* As recited in the "Agreement Regarding Make-Whole Note" entered as part of the overall transaction, KRW owed the creditor a $2.5 million prepayment penalty. As part of the overall purchase and sale transaction, HTA agreed to guarantee that debt on behalf of KRW. In turn, KRW agreed to reimburse HTA for whatever portion of the prepayment penalty HTA might have to pay. Importantly, KRW further agreed that any rents HTA collected from third parties during the four-year lease term would secure KRW's agreement to reimburse HTA.

¶15        Accordingly, as the arbitrator found in resolving the HTA-KRW claim, rent collected on third-party leases on the Master Lease property were not to be credited against the $7 million KRW owed to HTA under the Master Lease.  Instead, when HTA paid KRW's creditor on the Make-Whole Note, HTA was entitled to reimburse itself from those third-party rents.  By the same token, the 2010 Guaranty did not extend to or encompass KRW's obligations under the Make-Whole Note.  As security for KRW's agreement to reimburse HTA for anything HTA might have to pay under the Make-Whole Note, HTA could look only to the third-party rents.  This is why the arbitrator described the situation as one in which "HTA's net purchase price [was] $102.5 million less any lease payments that might be received from third parties under the Master Lease."  The two obligations — the $7 million owed under the Master Lease, guaranteed by Roskamp, and the $2.5 million HTA agreed to pay on the Make-Whole Note, secured by the third-party rents—were distinct components of the overall transaction.  Accordingly, we reject Roskamp's argument that rents HTA received from third-party tenants on the property should reduce Roskamp's obligations under the 2010 Guaranty.  That contention finds no support in the language of the agreements.  *See Miller v. Hehlen*, 209 Ariz. 462, 466, ¶ 12 (App. 2005) ("[C]ourts are not constrained by textual omissions to abandon common sense and experience or to ignore the surrounding circumstances of an agreement.").

### 2.        The Paragraph 9 cap.

¶16        Roskamp further argues that the judgment against it exceeds the cap imposed by Paragraph 9 of the 2010 Guaranty.  According to Roskamp, Paragraph 9 establishes a cap that, under the circumstances, is at most $2 million.  We read Paragraph 9 *de novo* so as to give effect to the parties' intent at the time of agreement and within the context of the entire agreement.  *See ELM Retirement Ctr.*, 226 Ariz. at 290–91, ¶ 15.

¶17        Paragraph 9 of the 2010 Guaranty states in full:

> 9.   Notwithstanding anything to the contrary contained herein, the liability and obligations of [Roskamp] shall be limited to an amount not to exceed Seven Million and No/100 Dollars ($7,000,000.00) <u>minus</u> the sum of (a) the amount of any payments made to [HTA] under the Lease that have not been made from amounts deposited in the Escrow Account, and (b) the amount of any Permitted Investments (as defined in the Cash Collateral Agreement) that have been deposited into the Escrow Account.

Thus, Paragraph 9 establishes a cap on the Guaranty of $7 million, less (1) payments "made . . . under the Lease that have not been made from amounts deposited in the Escrow Account" and (2) "Permitted Investments" deposited into escrow.

¶18         Roskamp asserts, and HTA does not dispute, that the $7 million cap was reduced by some $2 million in "Permitted Investments" deposited in escrow. Roskamp also argues that the cap was further reduced by $3 million in cash that it deposited into escrow. The language of the 2010 Guaranty, however, cannot sustain that interpretation. The provision at issue allows the cap to be reduced by "payments made to [HTA] . . . that *have not been made* from amounts deposited in the Escrow Account." (Emphasis added). We cannot construe that language to mean just the opposite, namely, payments that *have been* made from amounts deposited in the Escrow Account. Moreover, the record shows that KRW made no payments directly to HTA (i.e., outside of the escrow account). Nor can Paragraph 9 be construed as an agreement that the $7 million cap would be reduced by rents HTA collected from third parties on the Master Lease space. *See* ¶ 15 *supra*. Rents from third parties are not "payments made to Lessor *under the Lease*," as Paragraph 9 provides. (Emphasis added).

¶19         For these reasons, the superior court did not err in granting summary judgment to HTA in the amount of $4,125,973, well below the negotiated cap of $5 million. *See ELM Retirement Ctr.*, 226 Ariz. at 290–91, ¶ 15; *Voight v. Ott*, 86 Ariz. 128, 133–34 (1959) (doctrine of *expressio unius est exclusio alterius* applies to contracts).

## D.    Attorney's Fees.

¶20         The 2010 Guaranty states that the prevailing party in a dispute "concerning the performance, meaning or interpretation" of the guaranty "shall be awarded any and all costs and expenses incurred," including "court costs and attorneys . . . fees." "It is well-settled in Arizona that contracts for payment of attorneys' fees are enforced in accordance with the terms of the contract." *Bennett Blum, M.D., Inc. v. Cowan*, 235 Ariz. 204, 206, ¶ 8 (App. 2014); *see also* A.R.S. 12-341.01(A) (2017). Under the 2010 Guaranty, and applying *Schweiger v. China Doll Restaurant*, 138 Ariz. 183, 187–88 (App. 1983), the superior court awarded HTA $490,694 in attorney's fees and $24,243 in costs. In its award, the superior court reduced the fees HTA sought by $6,820, representing the work its lawyers performed but later abandoned after HTA amended its complaint to reference the 2010 Guaranty rather than the 2009 Guaranty.

**¶21**　　　　On appeal, Roskamp argues the superior court should have awarded it all the fees it incurred before HTA amended the complaint because Roskamp was the prevailing party in that part of the litigation.　It cites a comment the superior court made in its fees award that Roskamp "did not breach the 2009 [Guaranty]," and argues based on that remark that Roskamp must have been the prevailing party up until the point HTA amended the complaint.　Determination of the prevailing party for purposes of a fee award, however, is within the sole discretion of the superior court, and we will not disturb its finding "if any reasonable basis exists for it." *Bobrow v. Bobrow*, 241 Ariz. 592, 598, ¶ 25 (App. 2017).　The superior court determined in its discretion that Roskamp was not the prevailing party under the original complaint because Roskamp obtained no relief under that complaint.　We cannot conclude the superior court abused its discretion in that determination.　Accordingly, and "[i]n light of the totality of the litigation, there is a reasonable basis for the superior court's conclusion," and we therefore affirm it. *Lee v. ING Inv. Mgmt., LLC*, 240 Ariz. 158, 161, ¶ 10 (App. 2016).

## CONCLUSION

**¶22**　　　　We affirm the superior court's judgment.　We grant HTA its costs on appeal and its reasonable attorney's fees pursuant to the 2010 Guaranty and A.R.S. § 12-341.01(A), contingent on its compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED:  AA

9